UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

Amy Lynne Kulsic

     v.                                    Civil No. 14-cv-34-JL
                                          Opinion No. 2015 DNH 031

Carolyn W. Colvyn, Acting Commissioner,
Social Security Administration

**ORDER ON APPEAL**

Amy Lynne Kulsic has appealed the Social Security
Administration's denial of her application for a period of
disability and disability insurance benefits, which claimed an
onset date of June 2005.  An administrative law judge at the SSA
("ALJ") ruled that, despite Kulsic's severe impairments
(including obesity, sleep apnea, depression, anxiety, stress
disorder, bipolar disorder, and attention deficit hyperactivity
disorder), she retains the residual functional capacity ("RFC")
to perform jobs that exist in significant numbers in the national
economy, and, as a result, is not disabled.  See 20 C.F.R.
§ 404.1505(a).  The Appeals Council later denied Kulsic's request
for review, see id. § 404.968(a), with the result that the ALJ's
decision became the final decision on Kulsic's application, see
id. § 404.981.  Kulsic appealed the decision to this court, which
has jurisdiction under 42 U.S.C. § 405(g) (Social Security).

Kulsic has filed a motion to reverse the decision.  See L.R.
9.1(b)(1).  She argues that, in determining her RFC, the ALJ

erred by (1) finding her allegations of disabling symptoms to be less than fully credible and (2) ignoring evidence in her medical records, including the opinions of a psychiatric nurse practitioner who had briefly treated Kulsic.  The Acting Commissioner of the SSA has cross-moved for an order affirming the ALJ's decision, see L.R. 9.1(d), arguing that substantial evidence supported the ALJ's RFC determination and that he adequately addressed any contrary medical evidence.  For the reasons explained fully below, the court agrees with the Commissioner, and therefore grants her motion to affirm (and denies Kulsic's motion to reverse) the ALJ's decision.

**Credibility.**  At the hearing before the ALJ, Kulsic testified to symptoms of her psychological impairments, including (as her testimony is summarized in the joint statement of facts) that "she had more bad days than good"--indeed, she was then having "five bad days a week."  Kulsic explained that "on bad days she did not even get off the couch" and "her husband stayed home to help her."  Kulsic testified, in fact, that she had been unable to cook or to fold laundry or wash dishes in a timely manner.  Kulsic further related that "she did not like leaving the house because it made her anxious, and leaving the house was the primary cause of her anxiety," also describing "paranoia

. . . that someone was going to come in the house and kill her or hurt her family." Kulsic also testified to trouble concentrating, having "given up on reading books" in favor of "magazines with pictures," and that "she did not even read her son's school work because it was too long" (her son, at that point, was in kindergarten).

The ALJ found that, while Kulsic's "medically determinable impairments could reasonably be expected to cause some of [her] alleged symptoms," her "statements concerning the intensity, persistence, and limiting effects of these symptoms are not credible." Specifically, the ALJ found that, "[a]fter assessing the combined impact of [Kulsic's] obesity and [sleep apnea] with her mental impairments, . . . [she] would be capable of performing low-level semiskilled work in a low stress environment, as long as she has only occasional contact with the public and with co-workers" (parenthetical omitted).

In explaining this conclusion--which the ALJ proceeded to do over the next four-plus single-spaced pages of his written decision--the ALJ relied on several factors, a non-exhaustive summary of which follows. First, the ALJ noted that Kulsic had been able to perform what she described as the "highly stressful" job of network analyst for Comcast from 2000 until 2004 (aside from a period of short-term disability between August and

December 2000), despite receiving treatment for psychological
symptoms that were "very similar" to those she described as her
present problems at the time of the hearing.  Second, the ALJ
noted that Kulsic's mental status examinations between 2006 and
2010 on the whole reflected symptoms less severe than the ones
she described at the hearing, including:  a two-year period
(2006-2007) where "the majority of her mental status examinations
displayed . . . normal concentration"; another period (April
2009-August 2009) when she "seemed to be doing reasonably well,
with a stable mood and only mild depression"; and the first half
of 2010, when (aside from "some periods where [her] symptoms
deteriorate") her mental status examinations were "within normal
limits" or showed "few significant abnormalities."  Third, the
ALJ observed that, after reporting that she felt "the best she
has felt in a long time" in June and July 2010, Kulsic "engaged
in no documented psychiatric treatment at all between July 2010
and January 2011," and (following "prolonged manic and depressive
periods" later that year) "little documented psychiatric
treatment after August 2011 until May 2012," when she "resumed
taking psychiatric medications" and "displayed a more stable
mood, less depression, and felt pretty good."

    Fourth, the ALJ relied on records of Kulsic's sessions with
her counselors reporting that, in early spring 2012, she began

work "organizing showings of products" by throwing "'passion parties' out of her home" at the rate of "approximately one 'passion party' per week"--a job that also required her to travel to Las Vegas in or around March of that year.[1]  In the ALJ's view, evidence of Kulsic's carrying out these activities "at precisely the time that she alleges her symptoms reached their peak dramatically reduces the credibility of her alleged social limitations" as well as her "alleged difficulties with memory and her alleged inability to focus and concentrate."  Fifth, the ALJ relied on a function report that Kulsic completed in which--in contrast to her testimony at the hearing--"she stated that she prepares meals daily, did the laundry once per week and performed cleaning activities as needed."

As the Court of Appeals has instructed, "[i]t is the responsibility of the [ALJ] to determine issues of credibility and to draw inferences from the record evidence," so long as "a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support his conclusion."  Irlanda Ortiz v. Sec'y of HHS, 955 F.2d 765, 769 (1st Cir. 1991) (quotation marks omitted).  In attacking the ALJ's finding that her account of disabling psychological problems was not fully

─────────────────────

[1]While the ALJ's decision was not more specific on this point, the record shows that the products that Kulsic hawked at these parties were sex toys.

credible, Kulsic does not address the record as a whole, or, for that matter, the bulk of the ALJ's detailed reasoning.

Instead, Kulsic faults the ALJ for relying on "some activity in 2012," namely, her work as a consultant showing products at the "passion parties" in her home.  As Kulsic points out, there is no evidence as to how long she went on hosting these events and, in any event, a claimant's ability to do part-time work is not evidence that she can work full time despite her impairments.  See, e.g., Mason v. Astrue, 2013 DNH 013, 14 (quoting Teixeira v. Astrue, 755 F. Supp. 2d 340, 347 (D. Mass. 2010)).

Nevertheless, "evidence of daily activities can support a negative credibility finding," id., which is just how the ALJ saw the evidence of Kulsic's part-time work here (specifically relying on the fact, as just discussed, that she was engaged in those activities "precisely the time that she alleges her symptoms reached their peak").[2]  Kulsic also asserts that the ALJ

---

[2]This observation also addresses Kulsic's suggestion that considering her activities in 2012 was error because "the ALJ was supposed to be considering the period of time between the alleged onset date in 2005 and the date last insured in 2011."  Since Kulsic claimed her symptoms had worsened in 2012, it was entirely appropriate to assess her credibility by looking to evidence of contradictory activities around the same time.  In any event, "evidence generated after a claimant's insured status expires may be considered for what light (if any) it sheds on the question of whether [the] claimant's impairments reached disabling severity before [her] insured status expired."  Moret Rivera v. Sec'y of HHS, 19 F.3d 1427 (table), 1994 WL 107870, at *5 (1st Cir. Mar. 23, 1994).

"fails to address the fact that these activities were performed during a 'manic period,'" but that is not reflected in the providers' notes documenting these activities, nor anywhere else in the record that Kulsic identifies.  Again, it was up to the ALJ to decide what inference to draw about Kulsic's credibility from the evidence of her part-time work activities that involved hosting a weekly party at her house for the purpose of selling sex toys (which, as the ALJ noted, "requires an ability to maintain a schedule, interpret at least simple information, and keep track of information"--to say nothing of regularly interacting with groups of people about a potentially taboo subject to persuade them to make purchases) as contrasted with her testimony to suffering from crippling depression, isolating anxiety, and a complete inability to concentrate during that same period.  See Irlanda Ortiz, 955 F.2d at 769.

The same is true of the function report, in which, as discussed above, Kulsic reported daily activities exceeding those she described in her testimony at the hearing.  Kulsic offers that, given her claim to difficulty in concentrating well enough to read (indeed, she testified that she could not even make it through her kindergartner's schoolwork), "a rational conclusion could be reached" that her responses on the report reflect inattention or misunderstanding.  But that is not the only

"rational conclusion" and, again, whether to view the report as contradicting Kulsic's testimony or to disregard it as a mistake was up to the ALJ.  See Scanlon v. Astrue, 2013 DNH 088, 14-15 (noting the ALJ's prerogative as to how to treat the claimant's prior statements reflecting less severe symptoms).

While Kulsic also criticizes the ALJ for not asking her to explain the inconsistencies between the report and her testimony at the hearing itself, that criticism is not well-taken, since Kulsic was represented at the hearing by counsel who, by all rights, ought to have been the one ensuring her client had the chance to explain her damaging prior statements.  See Faria v. Comm'r of Soc. Sec., 187 F.3d 621 (table), 1998 WL 1085810, at *1 (1st Cir. Oct. 2, 1998).  In any event, even if Kulsic's criticisms of the ALJ's reliance on the function report--or, for that matter, Kulsic's work as a "passion party" hostess--had some force, the fact remains that, as already discussed, those were but two of a number of pieces of evidence on which the ALJ relied in deeming Kulsic's testimony as to disabling symptoms less than fully credible.  Kulsic's motion to reverse does not address that other evidence, which is itself sufficient to support the ALJ's adverse credibility determination.

**Medical evidence.**  Kulsic further argues that the ALJ erred by ignoring certain entries from her medical records which, on

8

her interpretation, "support that she has severe mental and nonexertional impairments, in addition to marked and severe restrictions, very low GAF [i.e., global assessment functioning] scores, and that she is unable to work." This argument, however, consists merely of a list with a brief description of each of those entries, without explaining how they undercut the ALJ's findings. As this court has cautioned, "simply referring to evidence before the ALJ is not enough to raise an argument that the ALJ erred in his or her consideration of that evidence." Gaudette ex rel. D.P. v. Colvin, 2014 DNH 022, 4 n.1.

Nevertheless, a few observations are in order. First, insofar as the entries show that Kulsic "has severe mental and nonexertional impairments," they are in fact consistent with the ALJ's findings, which included that Kulsic suffers from a number of such impairments. Of course, the fact that Kulsic has a severe impairment does not mean that the impairment is disabling, see Eaton v. Astrue, 2009 DNH 102, 20 (citing Foster v. Bowen, 853 F.2d 483, 488-89 (6th Cir. 1988)), and (aside from one entry discussed in more detail infra) Kulsic does not claim that any of the entries came to that additional conclusion.[3] Second, insofar

---

[3]Kulsic's motion also refers to a "Functional Capacities Evaluation" finding a number of moderately severe or severe restrictions on her mental or emotional functioning. But, while she provides a record citation for this document, her motion does not describe it more specifically (including by identifying its

as the entries show "very low GAF scores," this court has noted that "there is no 'statutory, regulatory, or other authority requiring the ALJ to put stock in a GAF score in the first place.'" Chapin v. Astrue, 2012 DNH 177, 14 (quoting Kornecky v. Comm'r of SSA, 167 Fed. App'x 496, 511 (6th Cir. 2006)).

Third, while one of the entries is a "medical source statement of ability to do work-related activities (mental)" form completed in September 2012 by Emily Weston, a psychiatric nurse practitioner who had begun treating Kulsic in May 2012, identifying certain marked limitations at odds with the ALJ's RFC finding, the ALJ expressly gave Weston's opinions "little weight." Specifically, the ALJ noted Weston's conclusions that Kulsic "had a marked restriction in her ability to respond appropriately to usual work situations and changes in a routine work setting," as well as that her "anxiety, inability to focus,

---

source) or develop any argument as to why the ALJ should have credited its findings, so any claim based on his failure to consider the "Functional Capacities Evaluation" is waived. See, e.g., Gaudette, 2014 DNH 022, 5 (quoting United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990)). It should be noted, though, that the evaluation (completed by a nurse practitioner) dates back to August 2002, nearly 3 years prior to Kulsic's claimed onset date--and during a time when, as already discussed, she was working full-time in a "highly stressful" job despite the many limitations identified in the "Functional Capacities Evaluation." The ALJ's failure to specifically address this record in his decision, then, does not undermine the validity of his conclusion. See Rodriguez v. Sec'y of HHS, 915 F.2d 1557 (table), 1990 WL 152336, at *2 (1st Cir. Sept. 11, 1990).

inability to communicate effectively, and [] depression would
make it impossible for her to work," but observed that "this is
inconsistent with the overall weight of the evidence of record."
The ALJ elaborated that, right around the time Weston rendered
this opinion, Kulsic "began hosting passion parties and traveled
to Las Vegas, which are both activities requiring [her] to
respond to changes in her surroundings and deal appropriately
with varied situations," as well as that "Weston's own treatment
notes from August and September 2012 indicate significant
improvement in [Kulsic's] symptoms inconsistent with finding
marked limitations in functioning."  Kulsic's motion does not
address this reasoning, which provides an ample explanation for
the ALJ's decision to give little weight to the opinions of her
treating nurse practitioner.  See, e.g., Allard v. Colvin, 2014
DNH 034, 10-12.

Because the ALJ's decision to find Kulsic's claimed symptoms
less than fully credible was supported by substantial evidence,
and because he adequately explained his decision to give little
weight to Weston's opinions (and Kulsic fails to adequately
develop her argument that the ALJ failed to address other medical
evidence), her motion to reverse the ALJ's decision[4] is DENIED,

---

[4]Document no. 7.

11

and the Commissioner motion to affirm it[3] is GRANTED.   The clerk

shall enter judgment accordingly and close the case.

**SO ORDERED.**

_____
Joseph N. Laplante
United States District Judge

Dated:  February 20, 2015

cc:  Christine Woodman Casa, Esq.
     T. David Plourde, AUSA

---

[3]Document no. 10.